NEW ORLEANS & N. PACKET & NAV. CO. *v.* LOUISVILLE UNDERWRITERS.

*(Circuit Court, E. D. Louisiana.* February 21, 1891.)

MARINE INSURANCE—TOTAL LOSS.

    A steam-boat sprung a leak, which the crew found it impossible to stop. They therefore, acting according to their best judgment, allowed the steam-boat to sink in shallow water, and abandoned her. The owner informed the insurance company, whose agent promised to go and take charge of the boat, but neglected to do so until she had become a total wreck. *Held,* that the insurance company was liable as for a total loss.

In Admiralty.

*O. B. Sansom,* for libelant.
*J. R. Beckwith,* for respondent.

PARDEE, J. This cause came on to be heard upon the record and evidence, whereupon the court finds the following facts in the case:

1. That libelant is a body corporate, created and existing under and by virtue of the statutes of Kentucky.

2. That respondent was long prior to the year 1888, and still is, a body corporate, created and existing by the statutes of the state of Kentucky, having the right to carry on the business of insurance in the state of Louisiana, upon condition that it would appoint an attorney within said state to transact its said business, and to accept service of process in all suits or proceedings commenced against it in the courts of said state; and that, complying with that condition, William M. Railey was duly appointed respondent's attorney within said state, and still is respondent's said attorney. That on the 5th day of October, 1888, at the city of New Orleans, respondent, by its said agent and attorney, contracted with libelant to insure for libelant, $7,000 on the hull, tackle, apparel, furniture, and appurtenances of the steam-boat Natchez, against the perils of the sea and rivers, fire and jettison, for a period of one year then

next ensuing; and, as evidence of that contract, respondent made and delivered the policy of insurance set out in the record.

3. That on the 31st day of December, A. D. 1888, the said steam-boat, being in the port of New Orleans, was properly manned, officered, and seaworthy for a voyage in her then regular trade and business between the said port of New Orleans and Vicksburg and the Bends on the Mississippi river.

4. That said steam-boat, at the time last mentioned, commenced her said voyage, and continued on it until between the hours of 1 and 2 o'clock in the morning of the 1st day of January, 1889; and, while she was navigated with reasonable prudence and care in said river, off a point known as "Wiley's Plantation," she ran on a mud lump in said river, and her head remained fast upon it for some time, and, in consequence thereof, her butts were sprung, and her seams were opened, and she made water very rapidly. That her officers and crew were of opinion that, by moving some of the steam-boat's fuel and freight well forward on her bow, her butts would spring back to place, and her seams would close up, and she could proceed on her voyage without danger. That the said fuel and freight were moved to her bow, and, with assistance rendered by the steam-boat Sunbeam, the Natchez was pulled off said mud lump, and proceeded to her then next landing, to-wit, Ben Lomond, at which landing she arrived about 4 o'clock in the morning, above stated. But, instead of closing her butts and seams, as her officers and crew expected, she made more water; and, on landing at Ben Lomond, so large a quantity of water had accumulated in her hold that she was in danger of going down in deep water at that place, so that her officers and crew deemed it prudent to cross the river to Lake Providence, and there put off passengers and light freight, with a view to ground the steamer in shallow water in that vicinity, if found necessary. That, pursuing that intention, said steam-boat was navigated from Ben Lomond to Lake Providence, where her passengers and light things were landed. That in crossing from Ben Lomond to Lake Providence very large quantities of water ran into her hold, causing her to roll from side to side in a dangerous manner, notwithstanding all her pumps and syphons were kept steadily at work. From Lake Providence the said steam-boat was at once navigated to a bar in said river, known as "Stack Island Bar," where she was grounded in water, the depth whereof then was as follows: On her port side, six feet; on her starboard side, six and a half feet, or thereabouts. That the said steam-boat, being grounded, rested on a sandy bottom from stem to stern, where she could have remained, and might have been subsequently rescued from destruction, but for subsequent events hereinafter stated. That, under all the circumstances, grounding the steamer on Stack island was the most prudent course that could have been adopted for the benefit of all persons concerned.

5. That said steam-boat was well supplied with pumps and syphons, and had ample power and means within herself to throw out great quantities of water; and that all her power and pumps and syphons were used

and employed without avail. That she had all pumps required by law to supply her boilers with water, having, in addition to the doctor, a donkey-engine and pump, mainly intended to supply the steam-boat with water at all parts, but capable and fit and arranged, according to the evidence, for supplying the boilers with water if the regular means of such supply failed; and that all these were used until about 10 o'clock in the day last above mentioned; and that their use was then abandoned, because large quantities of sand, drawn in with the water for her boilers, choked the valves of the pumps and rendered them useless; and it be-came impossible to keep steam in her boilers. When the pumps could be no longer worked, the master ordered the crew to be paid off. The first mate, with two deck-hands, stayed on the boat all that day. At 8 o'clock on the next day all left—engineers and all—on the steam-boat Sunbeam, for New Orleans, to bring out the steamer T. P. Leathers. According to the evidence in this case, in all the proceedings and move-ments of the master, officers, and crew of the steam-boat Natchez, from the time she struck the mud lump, about 1 A. M., January 1st, until the final abandonment of the said steam-boat, the said master, officers, and crew acted in good faith, and with their best judgment.

6. That at the time said steam-boat sustained damages, as first above mentioned, the Mississippi river was at a low stage of water, but imme-diately thereafter,—that is to say, when she grounded on Stack island, —the water began rising in said river rapidly, and the rise was so rapid that within three days thereafter said steam-boat was almost wholly sub-merged. That, in consequence of said rapid rise of water, a strong cur-rent set along-side of said steam-boat, and the gravel and sand on which she rested was washed away on her starboard side; and, in consequence thereof, said steam-boat fell over on her starboard side, her hog chains were broken, and her chimneys fell overboard, and she became, and was then, and ever since has been, a total loss, with benefit of salvage for ac-count of whom it might concern.

7. That there was in the vicinity, to-wit, at Wilson's Point, 12 or 14 miles above the place where the Natchez was put on the bar, and at Vicksburg, about 75 miles below, assistance in the way of vessels, with more or less pumping appliances, that could have been called to the aid of the Natchez before she bilged, and could have rendered assistance. The master and officers of the Natchez did not know that at Wilson's Point there was any boat capable of giving assistance, nor any such boat at Vicksburg, although the master knew that at Vicksburg there was a tug with, as he says, "a little syphon to pump out her barges," which, however, he did not believe, if obtainable, could be of any assistance. The pilot of the Natchez knew of the government boats lying at Wilson's Point, but it does not appear that he knew their services could be ob-tained, or that he communicated what knowledge he had to any of the other officers or crew of the endangered boat. The master and officers of the Natchez made no effort to procure assistance in the vicinity, but on the morning of the 2d of January practically abandoned the Natchez to her fate, knowing that the river was rising, and that the vessel must

become a wreck unless assistance was promptly obtained and rendered; and afterwards made no effort to save the hull of the vessel from becoming a total wreck, or to dismantle her hull to save any of the vessel's machinery.    As a fact the court cannot find from the evidence that assistance obtainable in the vicinity could have availed to save the Natchez, after she was beached on Stack Island bar, from total loss.

8. That notice of the disaster was sent by telegram by the steamer's master from Lake Providence to Thomas P. Leathers, libelant's general superintendent at New Orleans, which notice was received by him at his dwelling-house in New Orleans, about 8 o'clock on the morning of the said 1st day of January, 1889.    That one Harpham, a person usually employed by respondent to go to and to take charge of the work and business of steam-boats in distress, being in the city of New Orleans on the said 1st day of January, 1889, called at the place of business of libelant's superintendent, and there speaking with the said superintendent, Thomas P. Leathers, promised and agreed to go with all possible dispatch to the said steam-boat Natchez, and, on arriving there, to take charge of and control of the business and work of saving said steam-boat. That the said Leathers, at the request of the said Harpham, telegraphed to the said master of the said steam-boat to retain and keep on board whatever officers and crew might be needed for the purposes mentioned, and to be governed by the said Harpham in saving said steam-boat. That letters were written by said Leathers to the master of the steam-boat, instructing him to obey said Harpham's directions in all matters pertaining to said business, which letters were delivered to said Harpham in the office of respondent's said agent, for him to carry them to the master of said steam-boat at Lake Providence.    That afterwards, on the 2d day of January aforesaid, said Harpham renewed his promises to go to said steam-boat for the purposes mentioned, and that said respondent's said agent, William R. Railey, was present when the said promises were made, and was cognizant of all that had taken place between said Harpham and said Leathers.    And the said Harpham parted with said Leathers on the day last above mentioned, giving the said Leathers to understand that he would proceed by the then evening's train for said steam-boat for the purposes above mentioned; but, instead of so proceeding, said Harpham neglected to proceed as he had promised to do, being ordered to another steam-boat then in distress by respondent's secretary, J. L. Shallcross.    That said respondent's agent, Railey, well knew that Harpham had been ordered by Shallcross not to proceed to the steam-boat Natchez, and that these directions so given by Shallcross to Harpham were never communicated to Leathers until said Shallcross arrived in New Orleans on the next Saturday.    That in consequence of the representations and promises of said Harpham as aforesaid, understood to be with the consent and approval of said Railey, the libelant took no steps other than as enumerated in these findings to send aid and assistance to said stranded steam-boat, or to preserve the said wreck or any of the parts or property thereof, but considered and treated said steam-boat as totally lost, and as properly abandoned to the insurance companies represented by said Railey.

9. That at the making of said contract of insurance, and from thence continually thereafter until the said steam-boat was lost as aforesaid, libelant was interested in the said steam-boat as owner thereof to the full amount insured by the respondent and all other insurers, to-wit, $20,-000.

10. That, if respondent is liable, under the facts of this case, for the full amount of the policy herein sued on, the said respondent is entitled to a reduction therefrom on account of premium note unpaid, partial losses heretofore paid, and proceeds of sale of cabin and outfit, in the sum of $1,462.64, leaving due on the said policy $5,537.36, as shown by the commissioner's report in the record of this case, which report is not contested. That proofs of loss under the policy were duly made and presented to the respondent on the 22d of January, 1889, and the amount of loss became due and payable March 23, 1889.

### CONCLUSIONS OF LAW.

1. That the respondent company is liable to the libelant for the full amount of the policy issued by the said company on the steam-boat Natchez in favor of libelant, subject to the deduction mentioned in the last finding of fact, with interest thereon from March 23, 1889, at 5 per cent. per annum until paid.

2. That libelant should have a decree against the respondent company for the sum of $5,537.36, with interest at 5 per cent. from March 23, 1889, until paid, and for all costs' of suit.